**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------X

SONIA LAROSE,

                    Plaintiff,

          - against -

NEW YORK FOUNDLING CHARITABLE
CORPORATION,

                    Defendant.

----------------------------------------------------------X

Case No.

**COMPLAINT**

**PLAINTIFF DEMANDS**
**A TRIAL BY JURY**

Plaintiff SONIA LAROSE (hereinafter "Plaintiff" or "Plaintiff LAROSE") by her

attorneys, PHILLIPS & ASSOCIATES, Attorneys at Law, PLLC, hereby complains of Defendant

NEW YORK FOUNDLING CHARITABLE CORPORATION (hereinafter "Defendant" or

"Defendant NEW YORK FOUNDLING") upon personal knowledge, as well as upon information

and belief, by alleging and averring as follows:

**NATURE OF THE CASE**

1.   Plaintiff LAROSE brings this action alleging that Defendant NEW YORK FOUNDLING

     violated Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-

     17 (amended in 1972, 1978 and by the Civil Rights Act of 1991, Pub. L. No. 102-166)

     ("Title VII"), the New York State Human Rights Law, New York State Executive Law §

     296, *et seq.* ("NYSHRL") and the New York City Human Rights Law, New York City

     Administrative Code § 8-107(1), *et seq.* ("NYCHRL") and seeks damages to redress the

     injuries she has suffered as a result of being subjected to a hostile work environment on the

1

basis of her sex/gender (sexual harassment) and retaliation for complaining of sexual harassment.

## JURISDICTION AND VENUE

2.      The jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3), and 28 U.S.C. §§ 1331 and 1343.

3.      This Court has supplemental jurisdiction over Plaintiff's claims brought under state and city law pursuant to 28 U.S.C. § 1367.

4.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as the Defendant resides within the Southern District of New York.

## PROCEDURAL PREREQUISITES

5.      Plaintiff filed charges of discrimination upon which this Complaint is based with the Equal Employment Opportunity Commission ("EEOC") and received a Notice of Right to Sue ("Notice") from the EEOC with respect to the charges of discrimination contained herein. A copy of the Notice is annexed hereto as Exhibit A.

6.      Contemporaneously with the filing of this Complaint, Plaintiff LAROSE mailed a copy of the Complaint to the New York City Commission on Human Rights ("NYCCHR") and the Office of the Corporation Counsel of the City of New York ("Corporation Counsel") pursuant to the notice requirements of Section 8-502 of the New York City Administrative Code. A copy of the certificate of service of the complaint on the NYCCHR and the Corporation Counsel is annexed hereto as Exhibit B.

## THE PARTIES

7.      At all times relevant hereto, Plaintiff LAROSE was a resident of the State of New York and County of Kings.

2

8.     At all times relevant hereto, Defendant NEW YORK FOUNDLING was and is a domestic not-for-profit corporation duly existing pursuant to, and by virtue of, the laws of the State of New York, with its principal place of business located at 590 Avenue of the Americas, New York, New York 10011.

9.     At all times relevant hereto, Defendant NEW YORK FOUNDLING was Plaintiff LAROSE's employer under Title VII.

10.    At all times relevant hereto, Defendant NEW YORK FOUNDLING was Plaintiff LAROSE's employer under the NYSHRL.

11.    At all times relevant hereto, Defendant NEW YORK FOUNDLING was Plaintiff LAROSE's employer under the NYCHRL.

## MATERIAL FACTS

12.    On or around February 18, 2021, Plaintiff LAROSE received an offer letter from Defendant NEW YORK FOUNDLING for the position of Direct Support Professional – Per Diem.

13.    Plaintiff LAROSE's offer letter assigned Plaintiff specifically to one of Defendant NEW YORK FOUNDLING's locations in Brooklyn, New York ("Brooklyn Facility") as well as Defendant's "Region 8" locations around Brooklyn.

14.    Plaintiff LAROSE always worked at the Brooklyn Facility and was not assigned to work at any other Defendant NEW YORK FOUNDLING facilities in Region 8.

15.    Further, Plaintiff LAROSE had worked at the Brooklyn Facility through an agency, Pride Health, for three years prior to Defendant hiring her directly as a permanent employee.

16.    Plaintiff LAROSE was assigned to work with the Brooklyn Facility residents with developmental disabilities who require varying levels of care.

17.   Upon information and belief, Defendant NEW YORK FOUNDLING classifies its residents as either "low-functioning" or "independent." Independent residents are permitted by Defendant NEW YORK FOUNDLING to enter and leave the facility on their own accord and require a lower level of care, while "low-functioning" residents, who are not able to perform daily life functions without assistance, must be always accompanied by staff members when they leave the facility.

18.   In or around early March 2021, Plaintiff LAROSE was assigned to "Apartment A" at the Brooklyn Facility, which housed three men with developmental and behavioral disabilities.

19.   Plaintiff LAROSE provided care and support to the apartment residents, including bathing them, if needed, cooking for them, doing their laundry, and cleaning their bedrooms.

20.   Apartment A housed two "low-functioning" residents as well as an "independent" resident, Resident X, who was assigned to Apartment A, in approximately late March 2021.

21.   Soon after Resident X was assigned to Apartment A, Robert, a Defendant NEW YORK FOUNDLING Behavior Specialist, informed staff members about Resident X's behaviors and needs, as Resident X's needs were different than those of the other residents assigned to Apartment A.

22.   Robert explained that Resident X had a history of violence, public masturbation, and defiance of authority. Robert had made an assessment of Resident X's behavior, which was kept in Resident X's "Behavior Book." The Behavior Book was accessible to all Defendant NEW YORK FOUNDLING staff at the Brooklyn Facility.  The staff were permitted to read all notes in the book and add their own notes to the book, as needed, to provide more information about Resident X's behavior.

4

23.     For example, if any staff members had an incident with Resident X, they were instructed to write it in the Behavior Book, so Robert could review it and keep Defendant NEW YORK FOUNDLING informed of Resident X's behavior.

24.     When Earnestine, one of the staff members, asked Robert how they were expected to deal with Resident X, if he was violent with them, Robert responded, "Run for your life."

25.     While Plaintiff LAROSE was previously trained on how to care for residents with aggressive behaviors, she was not trained on how to deal with residents who exhibited sexually aggressive behaviors.

26.     When Plaintiff LAROSE and her co-workers asked Jerry, Manager, Lashima, Supervisor, and Robert why Resident X was assigned to the Brooklyn Facility, which only housed "low-functioning" individuals with no violent behaviors, thus placed in a residence that did not appear to be the proper placement for  Resident X, Jerry, Lashima, and Robert, responded that Resident X was removed from the prior facility because there was a restraining order by a resident at that prior facility against Resident X and there were no other facilities where Resident X could be placed.

27.     Resident X also expressed to staff and management that the Brooklyn Facility was not the right placement for him, as he did not "belong there," once he learned upon his arrival that the Brooklyn Facility housed "low-functioning" residents.

28.     Robert and Jerry advised Apartment A staff members, including Plaintiff LAROSE, that Resident X was allowed to go in and out of the apartment, independently, and that staff members were not permitted to restrict Resident X from purchasing anything with his own money, even if it would be detrimental to his health.

29.  This was concerning as Resident X was known to buy alcohol and marijuana, which were known to interfere with his medications.

30.  Moreover, according to Robert and Jerry, staff such as Plaintiff LAROSE were only allowed to "counsel" Resident X that he was not allowed to have these items in his possession and attempt to redirect him toward healthier options.

31.  Even though it was apparent that consuming alcohol and marijuana caused Resident X to become even more violent, staff members were forbidden from confiscating alcohol, marijuana, or other property from Resident X.

32.  As a result of this policy, Resident X was frequently intoxicated at the Brooklyn Facility, which worsened Resident X's aggressive behavior.

33.  Upon his placement in Apartment A at the Brooklyn Facility, Resident X immediately became attached to Plaintiff LAROSE and began to exhibit inappropriate sexual attraction toward her.

34.  Because Plaintiff LAROSE's shift began at 11:00 p.m., the two other residents of Apartment A would typically be asleep when she arrived.  However, Resident X would keep himself awake and wait in Apartment A's living room for Plaintiff LAROSE's arrival. Resident X would tell Plaintiff LAROSE that he wanted a girlfriend and disclosed personal information to her.

35.  Resident X would also say to Plaintiff LAROSE, "I love you Sonia, I really do."  Then, Resident X began asking Plaintiff LAROSE to pray with him, make tea for him, which was not part of her job, and give him hugs.  Plaintiff LAROSE declined to hug Resident X but would occasionally make him tea and pray with him.

36.  One day, Resident X asked Plaintiff LAROSE to make him tea, but she declined to do so. In response, Resident X became extremely aggressive and yelled at Plaintiff LAROSE, calling her a "bitch."

37.  In or around April 2021, Resident X lost his "independent" resident status and was subject to additional "line of sight" restrictions, including losing the ability to leave and enter the premises without a staff escort, after Resident X was found intoxicated on the street by police and taken back to the Brooklyn Residence.

38.  However, Resident X blatantly disregarded his new restrictions and continued to enter and leave the Brooklyn Facility unrestricted and unaccompanied.

39.  If a staff member attempted to follow Resident X out of the facility, he would become outwardly aggressive and begin to threaten the staff member's life.

40.  Upon information and belief, when Resident X left without an escort or threatened his escort about accompanying him, Lashima and Jerry recorded the incident in Resident X's Behavior Book and reported Resident X to Defendant NEW YORK FOUNDLING's Human Resources Department ("HR") by email.

41.  Furthermore, if Resident X left without telling anyone at the Brooklyn Facility where he was going, Lashima and Jerry would have to notify the police that Resident X was missing.

42.  However, despite Resident X's change in status to "line of sight," Jerry and Robert informed the Brooklyn Facility staff members that they were still unable to confiscate alcohol and marijuana from Resident X.

43.  By May 2021, Resident X had begun to act possessive and sexually aggressive towards Plaintiff LAROSE.

44.  Whenever Resident X decided that Plaintiff LAROSE was not paying enough attention to him, Resident X would violently punch walls, break his own possessions, and throw objects all over his shared apartment.

45.  Resident X would repeat "I love you" and "I love you, Sonia" for Plaintiff LAROSE's entire shift, berate her when he thought she was speaking to other men, and tell her that she belonged to him.  He would then say, "I thought you were a good girl, but you're nothing but a bitch."

46.  If Plaintiff LAROSE spoke to any male staff member of Defendant NEW YORK FOUNDLING, Resident X would become angry and say to Plaintiff that she was "getting too close" to the male staff members.  Plaintiff LAROSE would respond to Resident X by saying, "I'm not your girlfriend, I'm your staff."

47.  Resident X would then become enraged, call Plaintiff LAROSE a "bitch," and then repeat, "I love you like a sister, I love you like a sister," or, if the male staff member was still present, he would say, "Take your hands off my sister."

48.  However, despite this assertion, it was clear that Resident X had an obsessive sexual attraction towards Plaintiff LAROSE because he continued to express disturbing sexual obsession with her and became possessive every time Plaintiff LAROSE spoke with another male in her presence.

49.  Further, Resident X only altered his obsessive remarks to refer to Plaintiff LAROSE a "sister" after he was scolded or rebuffed by Plaintiff LAROSE for making a romantic or sexual remark towards her.  Resident X then began to say to Plaintiff LAROSE that he would take Plaintiff LAROSE "away from [her] boyfriend because [Resident X] loved [her]."

50.    Additionally, on approximately two occasions between May and June 2021, Resident X reached his hand into his pants and rubbed his genitals in front of Plaintiff LAROSE without exposing his genitals to her.

51.    Shocked and disturbed, Plaintiff LAROSE would say to Resident X that he must "do that privately" in the restroom away from staff members.

52.    Plaintiff LAROSE would write incidents involving Resident X in Resident X's Behavior Book for Robert's review.  However, Robert never followed up with Plaintiff LAROSE after these incidents.

53.    Upon information and belief, upon reviewing incidents in the Behavior Book, Robert would have to discuss the behaviors with the staff and his supervisors.

54.    Plaintiff LAROSE told Resident X on multiple occasions that she was married and attempted to keep her distance from him when she worked, but Resident X continued to sexually harass her nearly every day she worked in Apartment A.

55.    Each time that Resident X subjected Plaintiff LAROSE to sexual harassment, Plaintiff complained to Jerry and Lashima.  However, the sexual harassment continued, unremedied.

56.    Resident X also exposed himself to other female staff, masturbated in their presence, told them to "suck [his] dick" and threatened their lives.

57.    In or around June 2021, after being subjected to sexual harassment by Resident X that was particularly obsessive and aggressive, Plaintiff LAROSE complained to Lashima and Jerry that Resident X became dangerous, if she did not give Resident X the amount of attention he desired, and requested to be removed from Apartment A for her own safety.

58.    Upon information and belief, when Plaintiff LAROSE complained about Resident X's behavior, Jerry and Lashima also sent a report of the behavior by email to Robert.

59.    Jerry and Lashima moved Plaintiff LAROSE from Apartment A to Apartment B of the
Brooklyn Facility, thus to another apartment in the same residential house. There was no
proposal by Defendant NEW YORK FOUNDLING to move Plaintiff to another apartment
in another facility, in order to fully separate Plaintiff from Resident X.  As such, Plaintiff
LAROSE still had to interact with Resident X on a daily basis.

60.    Shortly after Plaintiff LAROSE was moved to Apartment B, Resident X continued to
subject her to harassment by personally delivering to Plaintiff a letter expressing his
attraction to Plaintiff, while she worked in Apartment B.

61.    Because the letter and Resident X's continued sexual obsession made Plaintiff LAROSE
extremely uncomfortable, Plaintiff LAROSE began sneaking in and out of the house at the
beginning and end of her shift to avoid him.

62.    Plaintiff LAROSE would first look out the window of the residence to see if Resident X
was outside waiting for her. Plaintiff LAROSE would then ask the other staff member who
was on duty with her to go outside and make sure Resident X was not outside or staring
out of his window waiting for Plaintiff LAROSE. If the staff member did not observe
Resident X outside, Plaintiff LAROSE would then leave the Brooklyn Facility swiftly.

63.    Despite Plaintiff LAROSE's best efforts to avoid Resident X, she would regularly find
Resident X waiting for her outside or in the common areas of the Brooklyn Facility, when
he knew Plaintiff LAROSE's shift was starting or ending.

64.    When Resident X would see Plaintiff LAROSE outside the house, as she left the Brooklyn
Facility, he would tell Plaintiff LAROSE that he would "slash her tires and kill her" if he
"could not have her for himself."

65.     Plaintiff LAROSE again complained to Lashima and Jerry that Resident X was sexually harassing her and making violent threats against her life.

66.     However, Plaintiff LAROSE was forced to continue interacting with Resident X, as no action was taken to remedy the harassment and threats she endured.

67.     On approximately three occasions, Resident X gave other staff members letters to deliver to Plaintiff LAROSE.

68.     Resident X's letters to Plaintiff LAROSE expressed his attraction toward her, stated that he was "sorry" and would not "do that again," and that Resident X could not eat or sleep without Plaintiff. In the letters, Resident X also asked Plaintiff LAROSE to work in Apartment A again.

69.     Plaintiff LAROSE understood these letters to mean that Resident X was sorry for his continued sexual harassment of her and would not continue to harass her if she worked in Apartment A again.

70.     Since Plaintiff LAROSE did not respond to the letters and continued to avoid Resident X, Resident X began to wait outside the house each time Plaintiff would leave and yell at her: "I love you," "You don't love me anymore," and "Oh, so you're not talking to me? You'll see what I'm going to do to you."

71.     Between approximately June and September of 2021, Plaintiff LAROSE complained about once each week to Jerry and Lashima about Resident X sexually harassing her and making threats against her life.

72.     Jerry informed Plaintiff LAROSE that he was "sending messages and emails" to Defendant NEW YORK FOUNDLING's HR, but Plaintiff was not provided with any measures to

ensure her safety and remedy the abusive and frightening work environment in which she was working on a daily basis.

73.    Each time Plaintiff LAROSE complained to Jerry or Lashima, Jerry and Lashima continued to tell Plaintiff LAROSE that they were also sending reports to Robert, so he could assess Resident X' behavior further.

74.    Plaintiff LAROSE likewise wrote in Resident X's Behavior Book when Resident X sexually harassed or threatened her, so Robert could review the behavior directly, assess it and determine how it needed to be addressed.

75.    However, Robert did not intervene in any way.  Yet, on one occasion, when he was on-site at the Brooklyn Facility, he said to Plaintiff LAROSE, "Man, he is really obsessed with you," referring to Resident X.

76.    Plaintiff LAROSE heard from other coworkers, including Lashima, that Resident X was telling people that Plaintiff LAROSE did not love Resident X anymore.

77.    Furthermore, Resident X also repeated his threat that he was going to "kill [Plaintiff LAROSE] and slash her tires" to Plaintiff LAROSE's coworkers.

78.    Despite the fact that Defendant NEW YORK FOUNDLING's managerial employees, including Plaintiff LAROSE's direct supervisors and HR, as well as Robert, were fully aware that Plaintiff was being sexually harassed and threatened on an ongoing basis by Resident X, Defendant NEW YORK FOUNDLING utterly failed to remedy the hostile work environment in which Plaintiff worked and permitted Resident X's behavior to continue undeterred, thus subjecting Plaintiff to severe emotional distress and suffering.

79.    Then, on or around July 19, 2021, Plaintiff LAROSE finished her overnight shift and was escorted out of the building and to her car by two other staff members, Latoya and Nicole.

80.  Importantly, Defendant NEW YORK FOUNDLING did not set up the safety measure of Plaintiff LAROSE being escorted to her car by her co-workers.

81.  Instead, Plaintiff LAROSE would ask other staff members to accompany her to her car as a favor, or they would sometimes offer because they knew Resident X was continuing to harass her.

82.  On that day, Resident X was waiting for Plaintiff LAROSE in the yard, and when he saw Plaintiff LAROSE, he began once again to threaten her life. Latoya and Nicole witnessed the harassment and Latoya alerted Plaintiff to the fact that Resident X had a knife.

83.  Resident X was brandishing a knife and began walking behind Plaintiff LAROSE and Nicole, as he threatened to kill Plaintiff.

84.  Resident X had been previously witnessed by a neighbor in the area where the Brooklyn Facility is located, pacing outside the Brooklyn Facility, yelling while holding a large knife.

85.  While Plaintiff LAROSE and other staff were specifically instructed to lock kitchen knives in a particular box, out of Resident X's reach, it was shocking to Plaintiff that he had the ability to obtain a knife.

86.  Afraid for her life and exhausted from Defendant NEW YORK FOUNDLING's failure to address her complaints, Plaintiff LAROSE called the police, which arrived at the Brooklyn Facility, subsequent to her call, and arrested Resident X.

87.  Upon his arrest, Resident X was taken to the psychiatric ward at a hospital in Brooklyn. However, Resident X was released from the psychiatric ward hours later and returned to the Brooklyn Facility.

88.  Plaintiff LAROSE spoke to the police and made a report, as they were taking Resident X to the hospital. The Defendant NEW YORK FOUNDLING building manager was present

and heard Plaintiff LAROSE's allegations, including that Resident X had been consistently sexually harassing her.

89.   Plaintiff LAROSE called Jerry and reported the incident once Resident X was taken from the premises by the police. Jerry responded, "I'm tired of him [referring to Resident X]. I send emails and they [referring to HR] are not doing anything about it."

90.   Jerry then informed Plaintiff LAROSE that he heard from HR that Resident X was going to be moved "soon" but he did not have any more information.

91.   The next day, Plaintiff LAROSE returned to the Brooklyn Facility for her shift.

92.   Resident X intimidated Plaintiff LAROSE by sitting on a bench outside the residence and staring at her intently while she walked into the Brooklyn Facility and as she left the Brooklyn Facility after her shift.

93.   Soon after the July 19 incident, on a day when Plaintiff LAROSE was not at the Brooklyn Facility, Resident X demanded that a staff member, Kierra, call Plaintiff on her cellphone.

94.   Plaintiff LAROSE answered the phone and asked why Kierra had called. Kierra responded that Resident X was "acting up" and she felt that calling Plaintiff may help.

95.   Resident X then took the phone from Kierra and began yelling at Plaintiff LAROSE, calling her a "bitch." Resident X exclaimed, "Oh I don't want to hear nothing from you, you bitch, you don't love me, you're just like all of them."

96.   Then, on or around August 19, 2021, Plaintiff LAROSE and Latoya took another resident to a doctor's appointment in a Defendant NEW YORK FOUNDLING car.

97.   When they returned, Plaintiff LAROSE dropped the resident and Latoya off in the front of the building and proceeded to park the car in the parking area.

14

98.  Plaintiff LAROSE then began walking to Apartment B to continue working and greeted a male neighbor as she walked.  At the time, Resident X was sitting in the front yard of the house drinking rum. When Resident X saw Plaintiff LAROSE greet the neighbor, Resident X yelled, "She is mine!"

99.  Plaintiff LAROSE ignored Resident X and continued into Apartment B.  Resident X then followed Plaintiff LAROSE into Apartment B and asked aggressively, "Are you fucking that [n-word]?" referring to the male neighbor Plaintiff greeted.

100.  Plaintiff LAROSE ordinarily would have to lock the door of Apartment B behind her, so that Resident X would not be able to enter, but on this occasion, he followed her so closely that she was unable to close the door on time.

101.  Plaintiff LAROSE asked Resident X to leave the apartment. Resident X left and went back to sitting in the front yard.  Lashima and other staff members witnessed Resident X's behavior.

102.  Plaintiff LAROSE again complained to Lashima and Jerry about Resident X's possessive, harassing behavior.

103.  At the end of Plaintiff LAROSE's shift, Latoya again walked Plaintiff LAROSE to the gate for her safety.

104.  Since Resident X was still sitting outside waiting for Plaintiff LAROSE, she walked around the block multiple times before getting into the car, so Resident X would not see which car belonged to Plaintiff LAROSE.

105.  Plaintiff LAROSE continued to work in fear, as Defendant NEW YORK FOUNDLING continued to disregard her multiple complaints of sexual harassment against Resident X

15

and allowed Resident X to imprison Plaintiff LAROSE in an unbearable hostile work environment.

106.   Enduring no consequences for his dangerous actions against Plaintiff LAROSE, Resident X became bolder in his sexual harassment of Plaintiff LAROSE.

107.   Specifically, on or around August 31, 2021, while Plaintiff LAROSE was eating breakfast during the early part of the morning after her overnight shift, another staff member left Apartment B and did not lock the door to the apartment upon departing, unbeknownst to Plaintiff LAROSE.

108.   As a result, shortly after the staff member left, Resident X barged into Apartment B and immediately began accusing Plaintiff LAROSE of having sexual intercourse with men.

109.   Resident X told Plaintiff LAROSE that if Resident X could not have Plaintiff, then no one else could have her. Resident X was irate and again threatened to kill Plaintiff and slash her tires. Plaintiff calmly asked Resident X to leave the apartment, as he was not authorized to be there.

110.   However instead of leaving, Resident X became louder, aggressively approached Plaintiff LAROSE and then violently grabbed Plaintiff LAROSE's breasts with one hand and began pointing in her face with the other.

111.   As he grabbed Plaintiff LAROSE's breasts, Resident X continued to scream at Plaintiff that she was a "bitch" and repeated his threats of violence.

112.   Plaintiff LAROSE, fearful for her life, repeated to Resident X that he needed to leave Apartment B and that he had to stop groping her.

113.   Plaintiff LAROSE's coworker, Kenyatta, heard Resident X screaming and Plaintiff pleading with him to leave and went into Apartment B. Kenyatta stepped in between

Plaintiff and Resident X and attempted to redirect Resident X, who still had his hand on Plaintiff's breasts and was continuing to scream at Plaintiff, by counseling him to leave the apartment.

114. After Kenyatta's involvement, Resident X left the apartment and ran outside.

115. The two residents of Apartment B, who are severely developmentally disabled and nonverbal, were in the living room and witnessed Resident X's assault of Plaintiff.

116. After Resident X left the apartment, Kierra, went into the apartment to console Plaintiff LAROSE, who was deeply distressed and crying unconsolably.  Plaintiff was in shock and feared for her life.

117. Plaintiff LAROSE then called the police and reported the assault. The police found Resident X and brought him back to the Brooklyn Facility for Plaintiff to identify him.

118. Resident X was subsequently arrested and Plaintiff pressed charges against him.

119. Jerry was at the Brooklyn Facility when the police arrived with Resident X. Jerry spoke to the police that day about Resident X's behavior and heard Plaintiff LAROSE's statement to police.

120. After he made his statement to the police, Jerry told Plaintiff LAROSE that he would send another email about Resident X's continued behavior to HR.

121. When Robert learned of this incident, he told Plaintiff LAROSE that he was not going to advise her against pressing charges against Resident X for his behavior.

122. Then, on or about September 1, 2021, Resident X appeared in court, where he was personally served with Plaintiff LAROSE's Temporary Order of Protection ("TOP") against him.

123.   The TOP indicated that Resident X would be allowed back at the Brooklyn Facility only on September 1, 2021, in the presence of a police officer, to retrieve his belongings.

124.   Despite this court order, Resident X returned to the Brooklyn Facility without a police escort and continued residing in Apartment A, in violation of the TOP, thus preventing Plaintiff LAROSE from returning to work for fear of her safety.

125.   On or about September 3, 2021, Plaintiff LAROSE texted Mr. Martinez, HR employee for Defendant NEW YORK FOUNDLING, asking why Resident X had not been moved out of the facility despite her TOP against him and asking if she would be the one to be moved.

126.   Mr. Martinez responded that he did not have a copy of the TOP and asked Plaintiff LAROSE to send it to him for review but indicated that Plaintiff LAROSE would have to be moved to a different job site and that Resident X could not be moved because the Brooklyn Facility was Resident X's "current place of residence."

127.   Plaintiff LAROSE sent Mr. Martinez a picture of the TOP for his review, in response to which Mr. Martinez repeated that Defendant NEW YORK FOUNDLING would not be moving Resident X from the Brooklyn Facility because it was his "place of residence" and informed Plaintiff LAROSE that he believed that Resident X would be moved to a different facility in October.

128.   After some further exchange with Plaintiff LAROSE, Mr. Martinez stated that, since Plaintiff LAROSE was a per diem worker, she could be moved to any other Defendant NEW YORK FOUNDLING facility and would be scheduled to work at a different facility.

129.   Subsequently, Plaintiff LAROSE asked another HR employee, Tyisha, if there were any shifts available at other Defendant NEW YORK FOUNDLING facilities, but there were

no other opportunities available that matched Plaintiff LAROSE's schedule at the Brooklyn Facility, which was the only time Plaintiff LAROSE could work at a Defendant facility.

130. On or around September 14, 2021, Plaintiff LAROSE texted Myhisha, another HR employee asking if Myhisha knew of any available shifts at any Defendant NEW YORK FOUNDLING locations.

131. Myhisha responded to Plaintiff LAROSE stating that she could return Plaintiff to the Brooklyn Facility whenever Plaintiff was "ready" thus disregarding the fact that Plaintiff was not able to work at the Brooklyn Facility due to Resident X's continued presence there.

132. Myhisha then directed Plaintiff LAROSE to reach out to Tyisha or another HR employee, Marie, to get more information on available shifts elsewhere.  Plaintiff LAROSE informed Myhisha that she had already spoken to Tyisha and there were no openings.

133. Myhisha informed Plaintiff LAROSE that she would make calls in the morning and have someone follow up with Plaintiff LAROSE the next day, but no one followed up with Plaintiff LAROSE.

134. On or around September 20, 2021, Plaintiff LAROSE texted Myhisha that she still had not received a response, but Myhisha did not reply.

135. Then, on or around September 24, 2021, Plaintiff LAROSE again texted Myhisha asking if Myhisha could call Plaintiff LAROSE, but again Myhisha did not reply.

136. Due to Defendant NEW YORK FOUNDLING's failure to place Plaintiff LAROSE in another facility while Resident X continued to reside at the Brooklyn Facility, Plaintiff LAROSE was unable to return to work and continue earning her income at Defendant NEW YORK FOUNDLING.

137. Plaintiff LAROSE believes that there were other facilities where she could have been placed until Resident X was transferred, that matched the hours she worked at the Brooklyn Facility, but Defendant NEW YORK FOUNDLING refused to reassign her, in retaliation for her complaints of sexual harassment against Resident X.

138. Then, on or around October 2, 2021, Lashima called Plaintiff LAROSE and informed her that Resident X had been moved to another Defendant NEW YORK FOUNDLING facility and asked her to return to work, which Plaintiff agreed to do.

139. Upon information and belief, Resident X was moved to another Defendant NEW YORK FOUNDLING facility, also in Brooklyn, that allows residents to enter and leave without restriction.

140. Plaintiff LAROSE returned to work on or around October 10, 2021.

141. Then, on or around the evening of October 13, Plaintiff LAROSE arrived for her shift at the Brooklyn Facility.

142. At that time, she learned from Lashima that Resident X had returned to the Brooklyn Facility and had attempted to get into Apartment A right before Plaintiff LAROSE arrived at work. Resident X was instructed to leave the facility and did so prior to Plaintiff LAROSE arriving.

143. The next day, on or around the morning of October 14, Plaintiff LAROSE left the facility after finishing her shift.  Shortly after Plaintiff LAROSE left the facility, Colerene, another staff member, called Plaintiff LAROSE and informed her that Resident X was attempting to enter the Brooklyn Facility again.

144. Subsequently, upon information and belief, Resident X was charged and sentenced in a criminal court after pleading guilty to forcible touching of intimate parts.

145. Plaintiff LAROSE has been unlawfully discriminated against, humiliated, and degraded on the basis of her sex/gender. As a result, Plaintiff has suffered loss of rights, emotional distress, and loss of income and earnings.

146. Defendant NEW YORK FOUNDLING' actions and conduct were intentional for the purpose of harming Plaintiff LAROSE.

147. As a result of the acts and conduct complained of herein, Plaintiff LAROSE has suffered and will continue to suffer loss of income, future pecuniary losses, emotional pain and suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff further experienced severe emotional and physical distress.

148. Because Defendant NEW YORK FOUNDLING' conduct has been malicious, willful, outrageous, and done with full knowledge of the legion of law to the contrary, Plaintiff LAROSE demands punitive damages against the Defendant.

**FIRST CAUSE OF ACTION**
**DISCRIMINATION UNDER TITLE VII**

149. Plaintiff LAROSE repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

150. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, for relief based upon the unlawful employment practices of Defendant NEW YORK FOUNDLING.

151. Plaintiff complains that Defendant NEW YORK FOUNDLING violated Title VII's prohibition against discrimination based, in whole or in part, upon an employee's sex.

152. Defendant NEW YORK FOUNDLING engaged in unlawful employment practices prohibited by 42 U.S.C. § 2000e–2(a) by discriminating against Plaintiff because of her sex:

> It shall be an unlawful employment practice for an employer—
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, **sex**, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

153. Defendant NEW YORK FOUNDLING engaged in unlawful employment practices prohibited by Title VII, by maintaining a hostile work environment where Plaintiff was repeatedly sexually harassed.

154. Accordingly, as a result of the unlawful conduct of Defendant NEW YORK FOUNDLING, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to her under this statute.

## SECOND CAUSE OF ACTION
## DISCRIMINATION UNDER THE NYSHRL

155. Plaintiff LAROSE repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

156. Executive Law § 296 provides that:

> It shall be an unlawful discriminatory practice: "(a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, **sex**, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to

bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

157.  Defendant NEW YORK FOUNDLING engaged in an unlawful discriminatory practice by discriminating against the Plaintiff because of her sex (sexual harassment).

158.  Accordingly, as a result of the unlawful conduct of Defendant NEW YORK FOUNDLING, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to her under this statute.

## THIRD CAUSE OF ACTION
## RETALIATION UNDER THE NYSHRL

184.  Plaintiff LAROSE repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if set forth herein at length.

185.  New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "For any person engaged in any activity to which this section applies to retaliate or discriminate against any person because [s]he has opposed any practices forbidden under this article."

186.  Defendant NEW YORK FOUNDLING violated the section cited herein as set forth.

187.  Accordingly, as a result of Defendant's unlawful conduct, Plaintiff LAROSE has been damaged as set forth herein and is entitled to the maximum compensation available to her under this statute.

## FOURTH CAUSE OF ACTION
## DISCRIMINATION UNDER THE NYCHRL

188.  Plaintiff LAROSE repeats and realleges each and every allegation made in the above paragraphs of this complaint as if same were set forth herein fully at length.

189.  The New York City Administrative Code § 8-107(1) provides that:

It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, **gender**, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

190.    Defendant NEW YORK FOUNDLING engaged in an unlawful discriminatory practice in violation of the New York City Administrative Code § 8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against Plaintiff because of her gender (sexual harassment).

191.    Accordingly, as a result of the unlawful conduct of Defendant NEW YORK FOUNDLING, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available to her under this statute.

## FIFTH CAUSE OF ACTION
## RETALIATION UNDER THE NYCHRL

192.    Plaintiff LAROSE repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if set forth herein at length.

193.    The Administrative Code of the City of New York § 8-107(7) provides that it shall be an unlawful discriminatory practice:

"For any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title, (v) requested a reasonable accommodation under this chapter, or ([v]vi) provided any information to the commission pursuant to the terms of a conciliation agreement made pursuant to section 8-115 of this chapter."

194.    Defendant NEW YORK FOUNDLING violated the section cited herein as set forth.

195.    Accordingly, as a result of Defendant NEW YORK FOUNDLING's unlawful conduct, Plaintiff LAROSE has been damaged as set forth herein and is entitled to the maximum compensation available to her under this statute.

## SIXTH CAUSE OF ACTION
## DISCRIMINATION UNDER THE NEW YORK CITY ADMINISTRATIVE CODE

196.    Plaintiff LAROSE repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if set forth herein at length.

197.    The Administrative Code of the City of New York § 8-107(13) provides for employer liability for discriminatory conduct by an employee, agent or independent contractor. This sub-section states:

a. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.
b. An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

1. the employee or agent exercised managerial or supervisory responsibility; or
2. the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or
3. the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

c. An employer shall be liable for an unlawful discriminatory practice committed by a person employed as an independent contractor, other than an agent of such employer, to carry out work in furtherance of the employer's business enterprise only where such discriminatory conduct was committed in the course of such employment and the employer had actual knowledge of and acquiesced in such conduct.

198.    Defendant NEW YORK FOUNDLING violated the section cited herein as set forth.

199.     Accordingly, as a result of Defendant NEW YORK FOUNDLING's unlawful conduct, Plaintiff LAROSE has been damaged as set forth herein and is entitled to the maximum compensation available to her under this statute.

**JURY DEMAND**

200.     Plaintiff LAROSE requests a jury trial on all issues to be tried.

**WHEREFORE**, Plaintiff LAROSE respectfully requests a judgment against Defendant NEW YORK FOUNDLING:

A.     Declaring that Defendant NEW YORK FOUNDLING  engaged in, and enjoining Defendant from continuing to engage in, unlawful employment practices prohibited by the Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*, the New York State Human Rights Law, New York State Executive Law, § 296, *et seq.*, the New York City Human Rights Law, New York City Administrative Code § 8-107(1), *et seq.*, and New York State common law in that the Defendant discriminated against Plaintiff LAROSE on the basis of her sex/gender (sexual harassment), subjected her to retaliation for complaining of same, and intentionally inflicted emotional distress on Plaintiff;

B.     Awarding damages to Plaintiff LAROSE for all lost wages and benefits resulting from Defendant's unlawful discrimination, retaliation, and intentional infliction of emotional distress on Plaintiff, and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

C.     Awarding Plaintiff LAROSE compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven;

D.     Awarding Plaintiff LAROSE punitive damages;

E.     Awarding Plaintiff LAROSE attorneys' fees, costs, and expenses incurred in the

prosecution of the action; and;

F.      Awarding Plaintiff LAROSE such other and further relief as the Court may deem equitable,

just and proper to remedy Defendant's unlawful employment practices.

Dated:  New York, New York
        June 3, 2022

                                    **PHILLIPS & ASSOCIATES,**
                                    **ATTORNEYS AT LAW, PLLC**

                          By:       **/s/ Dorina Cela**
                                    Dorina Cela, Esq.
                                    Hannah Kucine, Esq.
                                    *Attorneys for Plaintiff*
                                    45 Broadway, Suite 430
                                    New York, New York 10006
                                    (212) 248-7431
                                    dcela@tpglaws.com
                                    hkucine@tpglaws.com

# Exhibit A

EEOC Form 161-B (11/09)

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | **Ms. Sonia Larose**<br>**C/O Phillips & Associates, Attorneys At Law, Pllc 45 Broadway, Suite 430,**<br><br>**New York, NY 10006** | From: | **New York District Office**<br>**33 Whitehall St ,5th Floor** |
|---|---|---|---|

| EEOC Charge No.<br>**520-2022-02561** | EEOC Representative<br>**Michael Woo,**<br>**Investigator** | Telephone No.<br>**929-506-5348** |
|---|---|---|

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

Less than 180 days have elapsed since the filing date. I certify that the Commission's processing of this charge will not be completed within 180 days from the filing date.

The EEOC is terminating its processing of this charge.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

|  | | FOR | 2-2-2022 |
|---|---|---|---|
| Enclosures(s) | **Judy A. Keenan,**<br>**District Director** | | *(Date Mailed)* |

cc:     **Joseph B Cartafalsa**
        **Respondent's Legal Counsel**
        **OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.**
        **599 Lexington Avenue, 17th Floor,**
        **New York, NY 10022**

Enclosure with EEOC
Form 161-B (11/09)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS    --    Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**.  Therefore, you should **keep a record of this date**.  Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.  Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.  If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS    --    Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years) before you file suit** may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 -- *not* 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.  Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION    --    Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE    --    All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice**.  (Before filing suit, any request should be made within the next 90 days.)

***IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.***

# Exhibit B

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------X

SONIA LAROSE,

                              Plaintiff,                    **Certificate of Service**

            - against-

NEW YORK FOUNDLING CHARITABLE
CORPORATION,

                              Defendant.

------------------------------------------------------------------------X

   I, HUMBERTO ALVAREZ, do hereby certify that on June 3, 2022, true copies of Plaintiff's
Complaint were sent out for service via certified U.S. Mail, return receipt requested, by depositing
same in an enclosed post-paid wrapper, in an official depository under the exclusive care and
custody of the United States Postal Service within New York State, upon the following individuals:

Annabel Palma, Chair                          Georgia M. Pestana
New York City Commission on Human Rights      Corporation Counsel of the City of New York
22 Reade Street                               New York City Law Department
New York, NY 10007                            100 Church Street New York, NY 10007

Dated:  New York, New York
        June 3, 2022

                                              HUMBERTO ALVAREZ